**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:
D.H.

**MEGAN B. QUIRK**
Public Defender
Muncie, Indiana

ATTORNEY FOR APPELLANT:
J.P.D.

**KRISTIN R. WILLADSEN**
Public Defender
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF D.D. and J.D.: | ) ) ) ) | |
| D.H. (Mother) and J.P.D. (Father) | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 18A02-1307-JT-657 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) ) | |

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Kimberly Dowling, Judge
The Honorable Brian Pierce, Magistrate
Cause No. 18C02-1205-JT-12
Cause No. 18C02-1205-JT-13

**March 3, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

D.H. (Mother) and J.P.D. (Father) (collectively, the Parents) appeal the involuntary termination of their parental rights to two of their children, D.D. and J.D. (collectively, the Children). Mother and Father challenge the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

The Parents have produced five biological children together. Their parental rights to their three eldest children were terminated in May 2005.[1] This appeal concerns the termination of the Parent's parental rights to their two subsequently-born sons, D.D. and J.D. By April 2011, the Parents had ended their relationship, and D.D. and J.D., who were at that time five and three years old, respectively, were living with Father. On April 29, 2011, the Department of Child Services (DCS) took custody of the Children when Father was arrested for drug offenses and probation violations. On May 2, 2011, DCS filed a Child in Need of Services (CHINS) petition alleging that the Children were CHINS because Father had been arrested and no caregiver was available for the Children. On the same day, the juvenile court

---

[1] We note that DCS did not seek a determination pursuant to Ind. Code Ann. § 31-34-21-5.6 (West, Westlaw current through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.) that reasonable efforts to reunify the Children with the Parents were not required due to the previous terminations of the Parents' parental rights to the Children's siblings.

2

held a detention hearing, placed the Children with Mother, and referred the case to a program of informal adjustment.

A little over two weeks later, Mother was arrested for Drug Court violations. Because Father was still incarcerated, DCS again took custody of the Children and filed a second CHINS petition. An initial hearing was held on May 31, 2011, at which Mother admitted that the Children were CHINS, and Father denied the allegations. The Children were subsequently adjudicated CHINS and wardship was granted to DCS.

Father pleaded guilty to class D felony maintaining a common nuisance and class A misdemeanor possession of marijuana and was sentenced accordingly. Father was released from jail in July 2011, and the Children were placed in his care shortly thereafter. Less than a month later, however, Father, who suffers from bipolar disorder and post-traumatic stress disorder, had a nervous breakdown and was admitted to the Marion VA Hospital for treatment. During this time, Father left the Children with an unauthorized caregiver, and the Children's whereabouts were initially unknown to the Family Case Manager (FCM). Once the Children were located, they were placed in foster care, where they remained following Father's discharge from the hospital. Mother remained in jail until December 2011 and then resided in halfway houses until April 2012.

DCS filed petitions to terminate the Parents' rights to the Children on May 18, 2012.[2] A review hearing in the CHINS case was held on July 2, 2013, at which the juvenile court

---

[2] Separate termination petitions were filed for both of the Children under separate cause numbers, and the juvenile court entered separate termination orders under each cause number. The separate trial court cause numbers have been consolidated under a single appellate case number.

observed that Mother and Father had both been visiting the Children on a regular basis and that Mother had cooperated with DCS with respect to participating in services and maintaining regular contact with the FCM. The juvenile court found that Father was not cooperative with services or maintaining contact with the FCM. The juvenile court entered an order authorizing Mother to have unsupervised visitation and Father to have supervised visitation, and allowing visitation to be increased or unsupervised at DCS's discretion.

After the juvenile court authorized unsupervised visitation for Mother, DCS planned to begin overnight visitation and transition to a trial home visit. Mother then moved residences and DCS received reports that Mother and her husband were using drugs. The FCM attempted to get into contact with Mother to conduct a drug screen, but was initially unable to locate her. Once the FCM finally made contact with Mother, she tested positive for marijuana and refused to provide information the FCM needed to investigate the allegations further. Based on the allegations, Mother's positive drug screen results, and her refusal to cooperate, DCS filed a motion to go back to supervised visitation, which was granted.

On December 5, 2012, Mother was arrested for conversion and possession of marijuana. She remained incarcerated throughout the rest of these proceedings. Father, on the other hand, apparently made progress over the next few months, and the Children were placed with him on December 21, 2012. The Children were removed on January 29, 2013, due to ongoing domestic violence in the home between Father and his wife. Father was subsequently arrested for domestic violence against his wife on February 14, 2013, and he

remained incarcerated until March 27, 2013. As of the date of the termination hearing, the domestic violence charges had not yet been resolved.

After a long series of continuances, the juvenile court held an evidentiary hearing on the petitions to terminate on April 19, 2013. Mother appeared at the hearing in custody and with counsel. Despite being released from jail, Father failed to appear, but counsel appeared on his behalf. At the hearing, FCM Mary Revolt testified that during the course of the CHINS and termination proceedings, Mother was offered nineteen drug screens. She refused or failed to appear for seven and submitted to twelve. Half of the drug screens Mother took were positive for illegal substances. Additionally, of the approximately two years that passed since the filing of the initial CHINS petitions, Mother was incarcerated for fifteen months. During her eight months of freedom, she lived at no fewer than three addresses. Aside from working for her landlord at one time to help pay for her rent and deposit, Mother was never employed during these proceedings.

FCM Revolt also testified that since the initial CHINS case was opened, Father was offered thirty-five drug screens. Father submitted to twenty-eight screens and refused or failed to appear for seven. Of the twenty-eight screens Father took, only nine were clean or within therapeutic limits for Father's prescribed medications. Additionally, Father's prescribed medications for his mental health issues did not regularly show up in his drug screens. Father was incarcerated three times after the CHINS case was opened, and he moved often when he was not incarcerated, living at five different residences during the course of the proceedings, often with friends or relatives. Father was never employed during

this time period, and he was arrested for domestic violence against his wife shortly before the termination hearing.

Officer Jamie Brown of the Muncie Police Department's domestic violence unit also testified at the termination hearing. Officer Brown testified that on February 14, 2013, she spoke with Father's wife, S.D., at the hospital. S.D. had a number of injuries and she told Officer Brown that she and Father had gotten into an argument and that he had hit her in the face while they were in a vehicle. S.D. further stated that Father had told S.D.'s brother that he was going to kill S.D. at a river. On the evening of February 14, Father drove S.D. to a river, but left because there were people around. They then went to Muncie, where S.D. was able to get away from Father and get help. S.D. also told Officer Brown that Father had bloodied her nose on two separate occasions prior to that evening, and that he would take her phone away and bolt doors to prevent her from escaping.

Aubrey Driscoll, who was the Children's therapist from June 2011 until August 2012, also testified at the termination hearing. Driscoll testified that the Children were both diagnosed with Oppositional Defiant Disorder and displayed troubling sexualized behavior. She testified further that the Children had one home-based appointment scheduled with her while they were in Father's care in August 2011, but when she arrived for the appointment, Father and the Children were not there. In August 2012, Driscoll transferred the Children to Denise Weiss, another therapist who specialized in treating children with sexualized behaviors. Weiss testified at the termination hearing that the Children had been sexually acting out and that it was imperative for them to be in therapy in order to prevent them from

6

acting out against other children. Weiss testified further that Father did not bring the Children to the two therapy sessions that were scheduled while they were in his care in December 2012 and January 2013. At the conclusion of the hearing, the juvenile court took the matter under advisement. On June 27, 2013, the juvenile court entered orders terminating the Parents' rights to the Children. The Parents now appeal. Additional facts will be provided as necessary.

The juvenile court made detailed findings in its order terminating the Parents' parental rights to the Children. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144

(Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw current through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.). The State is also required to prove that termination of parental rights is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D). The State's burden of proof in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw current through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.).

8

The Parents have filed separate briefs on appeal, and they both challenge the juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above. *See* I.C. § 31-35-2-4(b)(2). We first note DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the juvenile court found DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside the Parents' care will not be remedied and that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the Parents' care will not be remedied.[3]

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior

---

[3] Accordingly, we need not address the Parent's arguments with respect to the juvenile court's finding that there was a reasonable probability that continuation of the parent-child relationship poses a threat to the Children's well-being.

criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

In her brief, Mother attempts to analogize *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002), in which this court reversed the juvenile court's finding that the conditions that resulted in the child's removal and continued placement outside the mother's care would not be remedied. The facts of *In re E.S.* are not at all comparable to those at issue here. In that case, the mother was not offered services, but voluntarily sought assistance on her own, and DCS did not evaluate her progress in counseling. Here, however, Mother was offered services during the eight months she was not incarcerated. Specifically, she was offered drug screens and home-based services, and she participated in supervised visitation. To the extent Mother claims she should have been offered additional services, we again note that she was incarcerated for the majority of the proceedings. Thus, it was Mother's own criminal behavior and resulting incarceration that made it impossible for her to receive much more in the way of reunification services. In any event, this court has noted that "the provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal." *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App.

10

2000).

It is apparent based on the evidence presented at the termination hearing that Mother has a long pattern of criminal activity, spanning at least eight years and encompassing multiple felony convictions. Mother testified at the termination hearing that prior to the opening of the CHINS case, the Children had gone to live with Father because she was incarcerated. Approximately two weeks after the Children were placed in her custody after the initial CHINS filing in April 2011, Mother was again incarcerated for Drug Court violations and the Children were sent to foster care. In December 2012, Mother was again arrested, this time for conversion and possession of marijuana, and she remained incarcerated at the time of the termination hearing. Although Mother was scheduled to be released in May 2013, her consistent pattern of criminal behavior and incarceration support a conclusion that she is very likely to reoffend. Moreover, Mother repeatedly tested positive for illegal drugs throughout the CHINS and termination proceedings and she was uncooperative with FCM Revolt's attempts to investigate allegations of drug use in her home. Under the facts and circumstances presented here, we cannot say that the juvenile court's finding that the conditions that resulted in the Children's removal and continued placement outside Mother's care would not be remedied was clearly erroneous.

In his brief, Father argues that the juvenile court's ultimate finding that the conditions that resulted in the Children's removal and continued placement outside his care would not be remedied was clearly erroneous because the court did not give sufficient consideration to certain evidence in his favor. Father's argument in this regard is simply a request to reweigh

11

the evidence, which we will not do on appeal. Father also notes that he failed to appear at the termination hearing and the juvenile court denied his counsel's motion for continuance.[4] According to Father, he was therefore "not given the opportunity to respond to" the allegations of domestic violence against S.D. *Father's Brief* at 14. Father makes no argument that he did not receive notice of the hearing, and the record indicates that he was not incarcerated at the time. Father's failure to appear as ordered for the hearing simply does not amount to denial of an opportunity to be heard.

The evidence presented at the termination hearing establishes that Father tested positive for illicit drugs and negative for his prescribed medications on a regular basis. Father was incarcerated three times during the pendency of the termination and underlying CHINS proceedings. Additionally, the Children were twice placed back in his care, and both times were removed shortly thereafter. The first time, the Children were with Father for a little over two weeks before he suffered a nervous breakdown and was admitted to the hospital for treatment. At that time, Father left the Children with an unauthorized caregiver without notifying DCS. The Children were placed back in Father's care on December 21, 2012, and they were removed a little more than a month later due to reports of domestic violence in Father's household. After the Children were removed, Father was arrested for another domestic violence incident against S.D. Those charges had not yet been resolved at the time of the termination hearing. Moreover, Father missed every therapy session that was scheduled for the Children while they were in his care. In short, Father was given more than

---

[4] Father makes no argument that the denial of his motion for a continuance was an abuse of discretion.

one opportunity to parent the Children, and each time demonstrated that he was unable to do so adequately. In light of Father's continuing drug use, his failure to regularly take medications prescribed to treat his serious mental illness, his failure to ensure that the Children got the therapy they needed, and his ongoing domestic violence toward S.D., we cannot say that the juvenile court's conclusion that the conditions that led to the Children's removal and continued placement outside his care would not be remedied was clearly erroneous.

Finally, both Mother and Father appear to argue that the juvenile court's conclusion that termination was in the Children's best interest was clearly erroneous. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 2778 (Ind. Ct. App. 2013). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

Mother attempts to analogize her situation to the one presented in *In re G.Y.*, 904 N.E.2d 1257, in which our Supreme Court held that the juvenile court's conclusion that

13

termination was in the child's best interests was clearly erroneous. The facts of that case do not resemble those before us. In *In re G.Y.*, the mother was incarcerated one time during the proceedings for a crime she committed prior to the child's conception. Here, Mother was incarcerated twice during the proceedings, once for Drug Court violations and once for new offenses. Moreover, while Mother was not incarcerated, she repeatedly tested positive for illegal drugs and was uncooperative with FCM Revolt's attempts to investigate allegations of drug use in her home. Unlike the mother in *In re G.Y.*, Mother has demonstrated a longstanding pattern of criminal behavior that parenthood has not curtailed. Indeed, even the termination of her parental rights to her three eldest children has not dissuaded Mother from engaging in such behavior. This court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *See, e.g., Castro v. State Office of Family & Children*, 842 N.E.2d at 375.

FCM Revolt testified that she believed termination of parental rights was in the Children's best interests because of the repeated incarcerations of both Parents, their drug use and lack of stable housing, and the domestic violence in Father's home. Likewise, the Children's Court Appointed Special Advocate opined that termination was in the Children's best interests for the same reasons. In light of the evidence presented in this case, we cannot conclude that the juvenile court's finding that termination of the Parents' parental rights was clearly erroneous.

This court will reverse a termination of parental rights "only upon a showing of 'clear

error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

KIRSCH, J., and BAILEY, J., concur.